******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* EDWIN B.*
## (AC 46412)

Bright, C. J., and Westbrook and Prescott, Js.**

*Syllabus*

Convicted of manslaughter in the second degree and risk of injury to a child in connection with the death of his seven week old daughter, the defendant appealed. He claimed that the trial court's failure to give specific unanimity instructions as to both counts against him violated his right to jury unanimity under the sixth amendment to the United States constitution. *Held*:

The trial court's failure to give a specific unanimity instruction with respect to the count charging the defendant with manslaughter violated his sixth amendment right to jury unanimity, as that count was duplicitous because the state alleged two, separate instances of conduct, shaking the victim and delaying seeking medical intervention for the victim, that could have constituted individual bases for the manslaughter conviction, and there was a risk that the jurors were not unanimous with respect to which instance of conduct the defendant engaged in when finding him guilty.

The trial court's failure to give a specific unanimity instruction as to the count against the defendant charging him with risk of injury to a child violated his sixth amendment right to jury unanimity, as that count was duplicitous because the state presented evidence of two, separate instances of conduct, shaking the victim and delaying seeking medical attention for the victim, that constituted individual violations of the statute (§ 53-21 (a) (1)) governing risk of injury to a child, which the state concedes, and the state's argument that the defendant was not prejudiced by the duplicitous nature of this count and reversal of his conviction was not required was premised on an assumption rejected by this court with respect to the manslaughter charge, namely, that the jury unanimously found the defendant guilty of manslaughter on the basis of shaking the victim.

Argued December 9, 2024—officially released April 1, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of manslaughter in the first degree and risk

---

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

of injury to a child, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *D'Addabbo, J.*; verdict and judgment of guilty of the lesser included offense of manslaughter in the second degree and of risk of injury to a child, from which the defendant appealed to this court. *Reversed; new trial.*

*Hope J. Estrella*, deputy assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Emily Trudeau*, senior assistant state's attorney, for the appellee (state).

*Opinion*

WESTBROOK, J. The defendant, Edwin B., appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1)[1] and risk of injury to a child in violation of General Statutes § 53-21 (a) (1).[2] He claims that the court's failure to give specific unanimity instructions as to counts one and two violated his right to jury unanimity under the sixth amendment to the United States constitution.[3] We agree with

[1] General Statutes § 53a-56 provides in relevant part: "(a) A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

[2] General Statutes § 53-21 provides in relevant part: "(a) Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of . . . a class C felony . . . ."

[3] The defendant additionally claims that the court improperly (1) denied his request to instruct the jury that it should carefully consider the interrogation tactics used by the police in considering the defendant's statements to the police, (2) failed to instruct the jury on all elements of risk of injury, and (3) instructed the jury on the recklessness element of manslaughter in the second degree. Because we reverse the judgment of the court on the ground that the trial court's failure to give a specific unanimity instruction

the defendant that the court's failure to give specific unanimity instructions violated his right to jury unanimity. Accordingly, we reverse the judgment of conviction and remand for a new trial.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. The victim and her twin sister were born to the defendant and A in April, 2018. On May 24, 2018, around 3 a.m., the victim, who was diagnosed with colic, started crying. The defendant attempted to feed her, but she would not eat, so he took her into the bathroom to wash her face. From the bedroom, A heard the defendant tell the victim to "shut up," "calm down," and "quiet down," and she heard the victim choking and coughing. She also heard a noise that sounded like a "thud" or something, such as a shampoo bottle, hitting the sink. When the victim stopped crying, the defendant returned to the bedroom and handed the victim to A. A noticed that the victim was sleepy and her breathing was different. The defendant, who has an associate's degree in nursing, also noticed that the victim appeared injured. A then placed the victim in her crib, and she and the defendant went to sleep.

Around 6 a.m. on the same day, the victim's twin sister woke up for feeding, but the victim did not. A tried to feed, change, and bathe the victim, but, although the victim was moving and breathing, she did not fully wake up. A called the pediatrician's office, but no

as to counts one and two violated his right to jury unanimity, we need not reach these additional claims. Nevertheless, because the issue could arise on remand, we note that we agree with the state that the defendant's proposed instruction on interrogation tactics was argumentative and not a correct statement of the law. To the extent the defendant seeks such an instruction at a retrial, our Supreme Court in *State* v. *Griffin*, 339 Conn. 631, 693 n.29, 262 A.3d 44 (2021), cert. denied,     U.S.     , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022), set forth, with apparent approval, the trial court's instruction on how the jury should evaluate "the likelihood that particular interrogation tactics render a confession unreliable." Id., 693.

appointments were available until the afternoon. A and the defendant then decided to take the victim to the hospital.

The defendant and A arrived at the hospital with the victim around 10:30 a.m. After the emergency department personnel conducted a CAT scan and X-rays of the victim, Rebecca Moles, a child abuse pediatrician, informed the defendant that the victim had broken ribs, a broken collarbone, bleeding in and around her brain, and an injury to her brain. The victim also had bruising on both of her arms and her abdomen. Moles determined that the victim's injuries were consistent with squeezing of the ribcage and a forceful back and forth motion. She also determined that the injuries could not have resulted from a fall of four feet or less or from the victim's own activity. Moles therefore concluded that the victim's injuries indicated child abuse.

The Hartford Police Department dispatched officers to the hospital to investigate the circumstances of the victim's injuries. An officer spoke with the defendant, who did not offer any explanation for the victim's injuries. At the same time, another officer spoke with A, who stated that she did not cause the victim's injuries and agreed to go to the police station to give a statement. At the station, A told the officers that she brought the victim to the hospital because the victim was not eating or responding. She denied harming the victim.

The defendant also agreed to go to the station, where officers questioned him for approximately eight hours. Detective Ivette Berrios and Detective Tanya Ortiz, who both speak Spanish, assisted Detective James Newell in interrogating the defendant. Before the interrogation began, Berrios provided the defendant with *Miranda* warnings,[4] and the defendant signed a written waiver of his rights.

---

[4] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Throughout the interrogation, which was recorded, the defendant's story was inconsistent. He initially told the officers that he did not harm the victim, but he did not tell them that A had harmed her. After the officers pressed the defendant, however, he said that he saw A shake the victim. The officers continued interrogating the defendant, and Ortiz, trying to prompt the defendant to confess to harming the victim, told him that she believed the victim's injuries were an accident. Ortiz also told the defendant that he and A would both be charged if he did not tell the officers what happened. The defendant thereafter told the officers that he had dropped the victim, and he agreed to give a written statement.

The defendant's written statement provides in relevant part: "On May 24, 2018, at approximately 3 a.m. . . . [the victim] woke up. . . . [A] picked her up and gave her to me. I held her and tried to [console] her. I was standing when I had [the victim] in my arms, by my shoulder. When I tried to switch [the victim] to my other shoulder, [she slid] out from my arms. [The victim] hit the crib rail with her abdomen. Before she hit the floor, the back of her head hit the bed frame . . . . [The victim] [stopped] crying when she hit the floor. I became nervous, picked her up and took her to the bathroom. With my hands, I wet her face with water. [The victim] took a deep breath, her eyes [were] half open, and looked [as] if she was druggy. [Her] body was [limp] but she had movement [in] her legs and arms. After I dried her face with [a] towel, I took her to her crib. I spoke to her, but she did not react. I woke up [A] and told her that [the victim] was not okay and needed to go to the hospital. [A] told me to wait for the pediatrician. . . . I said to [A] that I was not going to wait. . . . We arrived at the [hospital] at approximately [6 a.m.] . . . . When I was being interviewed by the detectives, I was scared. I did not say to them

that [the victim] fell from my arms. I blamed [A] because I was scared and insecure. I [had] never seen [A] hitting or mistreating [the victim] . . . ."[5]

On May 25, 2018, the state obtained an arrest warrant and filed an information charging the defendant with assault in the first degree in violation of General Statutes § 53a-59 (a) (1),[6] risk of injury to a child in violation of § 53-21 (a) (1), and intentional cruelty to persons in violation of General Statutes § 53-20 (a) (1).[7] A few days later, on May 28, 2018, the victim died in the hospital. The medical examiner determined that the cause of death was "[a]cute and [c]hronic [b]lunt [i]njuries with [s]ubdural and [s]ubarachnoid [h]emorrhages and [r]ib [f]ractures." She certified the manner of the victim's death as homicide. On June 8, 2018, the state filed a substitute information charging the defendant with manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3),[8] assault in the first degree in violation of § 53a-59 (a) (1), and risk of injury to a child in violation of § 53-21 (a) (1).

On November 8, 2019, A signed an "Agreement Concerning Prosecution" (cooperation agreement) in which

[5] The defendant provided this statement to the police in Spanish, which Berrios typed in Spanish and subsequently translated into English.

[6] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[7] General Statutes § 53-20 provides in relevant part: "(a) (1) Any person who intentionally tortures, torments or cruelly or unlawfully punishes another person or intentionally deprives another person of necessary food, clothing, shelter or proper physical care shall be guilty of a class D felony. . . ."

[8] General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person. . . ."

she agreed to plead guilty to charges of risk of injury to a child in violation of § 53-21 (a) (1) and criminally negligent homicide in violation of General Statutes § 53a-58[9] for the death of the victim. The cooperation agreement further provided that A would "truthfully testify at any trial or other court proceeding with respect to any matters about which . . . the investigating police agency may request her testimony including at the trial of [the defendant]."

On September 12, 2022, the state filed another substitute information against the defendant, charging him with two counts. Count one of the information charged the defendant with manslaughter in the first degree in violation of § 53a-55 (a) (3), alleging that, "under circumstances evincing an extreme indifference to human life, [the defendant] recklessly engaged in conduct which created a grave risk of death to another person, and thereby caused the death of another person, to wit: [the victim], a seven week old infant." Count two of the information charged the defendant with risk of injury to a child in violation of § 53-21 (a) (1), alleging that "the defendant wilfully and unlawfully caused a child under the age of sixteen years to be placed in such a situation that the life and limb of such child was endangered, the health of such child was likely to be injured, and committed an act likely to impair the health of such child, to wit: [the victim], a seven week old infant."

The case was tried to a jury. Following the presentation of evidence and closing arguments of counsel, the court, *D'Addabbo, J.*, charged the jury on, inter alia, the elements of the charged offenses of manslaughter in the first degree and risk of injury to a child, as well

---

[9] General Statutes § 53a-58 provides in relevant part: "(a) A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person, except where the defendant caused such death by a motor vehicle. . . ."

as the lesser included offenses of manslaughter in the second degree and criminally negligent homicide. That same day, the jury returned verdicts of not guilty on the charge of manslaughter in the first degree and guilty on the lesser included offense of manslaughter in the second degree and on the charge of risk of injury to a child. The court sentenced the defendant to a total effective sentence of twenty years of incarceration, execution suspended after fifteen years, followed by five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

We first address the defendant's claim that the court's failure to give a specific unanimity instruction as to count one violated his sixth amendment right to jury unanimity.[10] He argues that count one was duplicitous

[10] The defendant acknowledges that he did not preserve this claim, and he seeks review pursuant to the bypass rule set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "Pursuant to *Golding*, a [defendant] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [defendant] of a fair trial; and (4) if subject to harmless error analysis, the [state] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two steps in the *Golding* analysis address the reviewability of the claim, [whereas] the last two steps involve the merits of the claim." (Emphasis in original; internal quotation marks omitted.) *State* v. *Daniels*, 228 Conn. App. 321, 342, 324 A.3d 820, cert. denied, 350 Conn. 926, 326 A.3d 248 (2024). The first two prongs of *Golding* are satisfied because the record is adequate for review and the defendant's claim is of constitutional magnitude. See *State* v. *Marcelino S.*, 118 Conn. App. 589, 594, 984 A.2d 1148 (2009) (claim that duplicitous charge violated defendant's right to jury unanimity satisfied first two prongs of *Golding*), cert. denied, 295 Conn. 904, 988 A.2d 879 (2010). For the reasons set forth hereinafter, we also conclude that the defendant is entitled to prevail under the third and fourth prongs of *Golding*.

Additionally, the defendant acknowledges that the relevant rules governing claims of lack of unanimity were articulated in *State* v. *Douglas C.*, 345 Conn. 421, 435, 285 A.3d 1067 (2022), and *State* v. *Joseph V.*, 345 Conn. 516,

because the state alleged two separate instances of conduct—shaking the victim and a delay in seeking medical intervention—that could have constituted individual bases for the manslaughter conviction. He further argues that the duplicity was not cured by a specific unanimity instruction and that he was prejudiced because there is a risk that the jurors were not unanimous with respect to which instance of conduct he engaged in when finding him guilty of manslaughter in the second degree.[11] We agree with the defendant.

529–31, 285 A.3d 1018 (2022), shortly after the defendant was sentenced. He argues that the rules announced in those cases apply retroactively as new constitutional rules announced during the pendency of direct review. Because the Supreme Court of the United States has stated that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication"; *Griffith* v. *Kentucky*, 479 U.S. 314, 322, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987); we agree with the defendant that *Douglas C.* and *Joseph V.* apply retroactively to the present matter. See also *State* v. *Velasquez-Mattos*, 347 Conn. 817, 849, 300 A.3d 583 (2023) (applying *Douglas C.* and *Joseph V.* retroactively because "all defendants whose cases [are] still pending on direct appeal at the time of [a law changing] decision should be entitled to invoke the new rule" (internal quotation marks omitted)).

[11] We note that the defendant did not request that the trial court give the jury a specific unanimity instruction. Further, the defendant did not object to the proposed charge or take an exception after the charge was given. The state has not argued on appeal that the defendant's failure to request a specific unanimity instruction constitutes an implicit waiver of this claim under *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), despite the fact that our Supreme Court has held that "[r]eview of the defendant's duplicity claim under *Golding*, and particularly whether the failure to provide a specific unanimity instruction requires reversal, turns on whether defense counsel's failure to object to the jury charge means that the defendant implicitly waived his right to an unanimity instruction pursuant to *Kitchens*." (Footnote omitted.) *State* v. *Velasquez-Mattos*, 347 Conn. 817, 846, 300 A.3d 583 (2023).

The state's decision not to argue that the defendant waived his right to a unanimity instruction is understandable. "[W]aiver is an intentional relinquishment or abandonment of a known right or privilege. . . . In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy." (Internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 469. "Among the rights that may be waived by the action of counsel in a criminal trial is the right of a defendant to correct jury instructions, even when fundamen-

The following additional facts are relevant to this claim. At trial, the state presented evidence that the defendant caused the victim's death by shaking her. It also presented evidence that the victim's injuries were worsened by the defendant's failure to seek timely medical attention. For example, Moles testified as follows: "So, with brain injury, there is what we call primary brain injury and secondary brain injury. So, primary brain injury is the actual trauma to the brain from the event—you know, from the shaking or the movement of the brain. And then, the brain doesn't like to get injured. So when it's injured, it swells . . . . And then,

tal rights are at issue." *State* v. *Velasquez-Mattos*, supra, 347 Conn. 847.

"[B]ecause the waiver of a constitutional challenge to jury instructions is implied rather than express, it arises from an inference that the defendant knowingly and voluntarily relinquished the right in question. . . . Nevertheless, when the law governing a defendant's constitutional claim has changed after the defendant's trial, counsel acting under binding precedent in effect at the time of the trial cannot make a knowing and intelligent waiver of rights affected by the later decision changing the law." (Citations omitted; internal quotation marks omitted.) Id., 848–49.

In *Velasquez-Mattos*, the defendant had already been sentenced when our Supreme Court decided *Douglas C.* and *Joseph V.*, but the matter was still pending direct review. See id., 847–48. Our Supreme Court explained that "[it] recognized for the first time [in *Douglas C.*] that a duplicitous information may yield two distinct and separate kinds of unanimity claims, and [it] adopted the federal test for claims of unanimity as to instances of conduct." Id., 850. Additionally, "[it] concluded for the first time [in *Joseph V.*] that the sexual assault statute . . . with which the defendant . . . was charged, does not criminalize a continuing course of conduct." Id., 851. The court therefore held that, "in light of the recent and significant change in our case law that occurred after the completion of the defendant's trial . . . defense counsel did not make a knowing and intelligent waiver of the right to unanimity as to instances of conduct pursuant to *Kitchens*" by failing to request a specific unanimity instruction. Id.

The present case is similar to *Velasquez-Mattos* in that *Douglas C.* and *Joseph V.* were decided while this case was pending direct review. Although neither *Douglas C.* nor *Joseph V.* expressly changed the case law regarding manslaughter, we are persuaded that the new test articulated for claims of lack of unanimity as to instances of conduct is a sufficiently significant change in our case law such that the defendant's failure to request a specific unanimity instruction did not constitute a knowing and intelligent waiver of the right to unanimity as to instances of conduct under *Kitchens*.

there can be additional injury to the brain because it swelled up and it gets squished. . . . And then . . . the brain also can have seizures, where the electrical impulses fire. And that can also cause injury to the brain. And all of those things can decrease the ability of the baby to breathe effectively, which then has even less oxygen to the brain. So, it's kind of a cycle. So, when a baby comes into the, someplace like the intensive care unit, part of, a big thing that the doctors are trying to do is break that cycle—so, stop that cycling; give medicines to try to stop the brain from getting continually injured . . . as a result of trying to stop those secondary injuries. So, the symptoms that a family or that a parent will see often are those initial symptoms. And then, they may see worsening of those symptoms or different symptoms as the secondary brain injury starts."

The defendant's theory of defense was that A shook the victim causing her primary injuries and was responsible for not seeking prompt medical treatment. The defendant testified that he saw A shake the victim and, when he attempted to intervene and take the victim from A, she would not release the victim until the defendant promised that he would not leave A. He further testified that, although he wanted to seek immediate medical attention for the victim, he did not do so because he did not want to further upset A. Because there were no other witnesses to what happened to the victim, the jury was left to decide whether they believed the defendant or A as to who shook the baby and who was responsible for the delay in seeking medical treatment.

During closing arguments, the prosecutor stated: "[W]ith manslaughter in the first degree, if you credit [A's] testimony—if you find that it was [the defendant] that was holding that baby in the bathroom at the time when the hysterical crying came to an abrupt end—then

you can find that this defendant engaged in conduct that created a grave risk of death to another." She also stated: "You know the risk. He engaged in the conduct. And he did nothing. It wasn't intentional, but it was reckless, and it demonstrated an extreme indifference to human life. When we look at the time frame in this case . . . 3 a.m., incident happens. Baby crying [and then] no crying. Four a.m., no medical treatment [and] no intervention. Five a.m., nope. . . . Ten-thirty [a.m.], that baby gets to the hospital. Ten-thirty [a.m.], that baby gets intervention and medical treatment. That's seven and [one-half] hours. Extreme indifference to human life. *And it caused* [*the victim's*] *death—that, we know for certain.*" (Emphasis added.) Furthermore, the prosecutor argued: "[The defendant's] nursing degree failed. I've seen videos of four year olds call the police when their parents are in distress. . . . Police rush to the house. There's medical intervention. He has a nursing degree. He testified to that. Yep. He failed." Finally, the prosecutor reiterated to the jury that "[the victim] deserved someone to step up and say—as that baby, [the victim], sat there hanging on for life—someone to say, 'Hey, I shook her. She got shaken. It was an accident. Can you fix it?' Dr. Moles talked about, it's about relieving pressure and swelling. And there's a few things that they do. That didn't happen."

With respect to count one, the court charged the jury with the elements of manslaughter in the first degree and the elements of the lesser included offense of manslaughter in the second degree. The court did not marshal any of the evidence to a specific count or specific elements of a crime. The jury thereafter found the defendant not guilty of the charged offense of manslaughter in the first degree and guilty of the lesser included offense of manslaughter in the second degree.

We now turn to the defendant's claim that the court's failure to provide a specific unanimity instruction as to

count one violated his right to jury unanimity. "The defendant's right to jury unanimity under the sixth amendment to the United States constitution ensures that a jury cannot convict unless it unanimously finds that the [g]overnment has proved each element of the charged crime. . . . [Our Supreme Court has] recognized that a duplicitous information may raise two distinct and separate kinds of unanimity claims: (1) unanimity as to a crime's elements, which occurs when a defendant is charged in a single count with having violated multiple statutory provisions, subsections, or clauses, and thus the court must determine whether the statutory provisions, subsections, or clauses constitute separate elements of the statute, thereby requiring jury unanimity, or alternative means of committing a single element, which do not require jury unanimity; and (2) unanimity as to instances of conduct, also known as a multiple acts or multiple offense claim, which occurs when a defendant is charged in a single count with having violated a single statutory provision, subsection, or clause on multiple, separate occasions. . . . [D]ifferent tests apply to a claim of unanimity as to elements and a claim of unanimity as to instances of conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Joseph V.*, 345 Conn. 516, 529–31, 285 A.3d 1018 (2022). "[B]ecause this claim is premised on an alleged infringement of the defendant's constitutional rights, our review is plenary." *State* v. *Douglas C.*, 345 Conn. 421, 435, 285 A.3d 1067 (2022).

In the present case, the defendant argues that count one was duplicitous because the state charged two, separate instances of *conduct* as the basis for a single violation of § 53a-56 (a) (1). Additionally, he argues that the court did not provide a specific unanimity instruction requiring the jury to agree on which act formed the basis for the conviction, creating a risk that the verdict was not unanimous as to a single course of

conduct. Our Supreme Court, in *Douglas C.*, adopted the following three-pronged test to determine whether a duplicitous charge violated a defendant's right to jury unanimity as to instances of conduct: "(1) Considering the allegations in the information and the evidence admitted at trial, does a single count charge the defendant with violating a single statute in multiple, separate instances? (2) If so, then does each instance of conduct establish a separate violation of the statute? If the statute contemplates criminalizing a continuing course of conduct, then each instance of conduct is not a separate violation of the statute but a single, continuing violation. To determine whether the statute contemplates criminalizing a continuing course of conduct, we employ our well established principles of statutory interpretation. Only if each instance of conduct constitutes a separate violation of the statute is a count duplicitous. And (3) if duplicitous, was the duplicity cured by a bill of particulars or a specific unanimity instruction? If yes, then there is no unanimity issue. If not, then a duplicitous count violates a defendant's right to jury unanimity but reversal of the defendant's conviction is required only if the defendant establishes prejudice."[12] Id., 448.

Under the first prong of *Douglas C.*, the defendant argues that count one charged him with violating § 53a-55 (a) (3) in two separate instances because the state presented evidence that he caused the victim's death by (1) shaking her and (2) failing to seek timely medical attention for her. We agree.

---

[12] The defendant filed no request for a bill of particulars. "The purpose of a bill of particulars is to inform the defendant of the charges against him with sufficient precision to enable him to prepare his defense and avoid prejudicial surprise. . . . A bill of particulars limits the state to proving that the defendant has committed the offense in substantially the manner described." (Internal quotation marks omitted.) *State* v. *Marcelino S.*, 118 Conn. App. 589, 593–94, 984 A.2d 1148 (2009), cert. denied, 295 Conn. 904, 988 A.2d 879 (2010).

A person commits manslaughter in the first degree pursuant to § 53a-55 (a) (3) when, "under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." The information, which alleges that, "on or about May 25, 2018, at approximately 3 a.m. . . . the defendant did commit the crime of manslaughter," does not specify which conduct violated § 53a-55 (a) (3). Although the reference to the approximate time of the crime occurring at 3 a.m. suggests that the focus of the charge was the shaking of victim, at trial, the jury heard Moles testify that the victim suffered a primary brain injury from being shaken and secondary injuries that continued to damage her brain until she received medical treatment. Additionally, the prosecutor, during her closing argument, emphasized the fact that the defendant delayed seeking medical attention for the victim for seven and one-half hours and that, by doing so, he caused the victim's death. Thus, the jury heard evidence and argument that the defendant's conduct of shaking the victim and/or failing to seek timely medical attention for her evinced recklessness and caused the victim's death.

In *Douglas C.*, the state presented evidence that the defendant touched the victim in a sexual and indecent manner multiple times in a single evening and that such conduct constituted a single violation of the risk of injury statute. *State* v. *Douglas C.*, supra, 345 Conn. 471. Our Supreme Court determined that "the jury reasonably could have interpreted the evidence admitted in only one of two ways. Although the length of time is unclear, the testimony of [the victim] shows that this touching occurred during the course of a single evening. From this evidence, the jury reasonably could have found that these acts constituted a single criminal episode of relatively brief, temporal duration and thus did

not constitute multiple, separate incidents of conduct under the first prong of the applicable test. Alternatively, from this evidence . . . the jury [reasonably could have] found under prong one of the applicable test that there was enough time between each act for the acts to constitute multiple, separate incidents of conduct . . . ." Id., 471–72.

Similarly, in the present matter, although the shaking and the initial decision not to seek medical attention occurred in close temporal proximity, the jury had independent bases to find the defendant guilty of manslaughter in the second degree. Jurors reasonably could have found that the defendant shook the victim causing the primary injuries that led to her death. Alternatively, one or more of the jurors reasonably could have concluded that the state failed to prove beyond a reasonable doubt that the defendant shook the baby but that the defendant's failure to seek prompt medical attention for her evinced recklessness and ultimately proximately caused the victim's death. Moreover, the act of shaking the victim was brief, but the decision not to seek medical attention continued for seven and one-half hours. From the evidence presented, the jury reasonably could have found that the shaking and the delay in seeking medical attention constituted multiple, separate incidents of conduct, rather than a single criminal episode.

The state maintains that the evidence that the defendant delayed seeking medical attention for the victim was not offered as the reckless conduct supporting the manslaughter charge or the lesser included offenses on which the jury was charged. Rather, the state argues that evidence of the delay was offered only to prove that he acted with extreme indifference to human life, which is a separate element of the offense of manslaughter in the first degree. We are not persuaded.

The prosecutor, during her closing argument to the jury, stated that the defendant's decision not to seek

medical attention after shaking the victim was both reckless *and* demonstrated extreme indifference to human life. In addition, her statement, immediately after detailing the defendant's delay in seeking medical treatment, that "it caused [the victim's] death—that, we know for certain" reasonably could have been understood by the jury as arguing that the failure to seek medical treatment was the cause of the victim's death. Such an understanding by jurors would have been particularly reasonable given Moles' testimony about secondary injuries and A's testimony that she pleaded guilty to negligent homicide for her failure to seek prompt medical treatment for the victim. Thus, as the case was presented to the jury, count one was premised on evidence of two, separate incidents of conduct, leading to the possibility that some jurors may have concluded that the defendant was guilty of manslaughter because he shook the victim, while others may have found him guilty because he did not seek prompt medical treatment for the victim.

Additionally, the second prong of *Douglas C.* is satisfied because the state does not argue that it charged count one under a theory that shaking the victim and delaying seeking medical attention constituted a continuing course of conduct. Rather, the state maintains that "count one was premised on a single instance of allegedly reckless homicidal conduct—shaking the victim violently enough to cause blood vessels in her brain to tear, hemorrhage, and result in her death." Because the state presented evidence of two, separate instances of conduct but did not present a continuing course of conduct theory, the jurors reasonably could have found the defendant guilty under count one for engaging in *either* instance of conduct, and their decision as to each may not have been unanimous. Thus, count one was duplicitous.

The third prong of *Douglas C.* is satisfied because the court did not give a specific unanimity instruction and, therefore, the duplicity of count one violated the defendant's right to jury unanimity. Still, "reversal of the defendant's conviction is required only if the defendant establishes prejudice, namely, that the duplicity created the genuine possibility that the conviction resulted from different jurors concluding that the defendant committed different acts." *State* v. *Douglas C.*, supra, 345 Conn. 447. The defendant argues that the duplicity of count one "severely prejudiced [him] because there was a substantial risk of a nonunanimous verdict based on the evidence in the case and the arguments advanced by the state . . . [upon which] separate jurors may have found that the defendant engaged in entirely separate instances of conduct." (Citation omitted.) Therefore, the defendant argues, reversal of his conviction under count one is required. We agree.

As we have discussed, the state presented evidence that the victim's brain injuries, which ultimately resulted in her death, were caused primarily by the shaking and secondarily by the delay in medical intervention. The state argued to the jury that both instances of conduct were reckless. On the basis of the evidence and how it was presented, jurors reasonably could have found the defendant guilty of manslaughter in the second degree because he shook the baby, delayed seeking medical attention for her, or both. Consequently, there is a real possibility that the jury was not unanimous in finding the defendant guilty of a *single* instance of conduct and, therefore, the defendant has established that he was prejudiced by the duplicity of count one. Accordingly, reversal of the defendant's conviction under count one is required.

## II

We next address the defendant's claim that the court's failure to give a specific unanimity instruction as to

count two violated his sixth amendment right to jury unanimity. The defendant argues that count two is duplicitous because the state presented evidence of two separate instances of conduct—shaking the victim and delaying seeking medical attention—that constitute individual violations of § 53-21 (a) (1).[13] We agree.

The state concedes that count two satisfies all three prongs of *Douglas C.* because the jury reasonably "could have found the defendant guilty of violating § 53-21 (a) (1) based on either instance of conduct, or both," and it further concedes that the duplicity was not cured by a specific unanimity instruction. The state argues, however, that the defendant was not prejudiced by the duplicitous nature of count two and, therefore, reversal of his risk of injury conviction is not required. Specifically, the state argues that the defendant was not prejudiced because "in finding the defendant guilty under count one of manslaughter in the second degree, the jury necessarily and unanimously found that he engaged in the conduct of shaking the victim and thereby caused her death . . . [which was] presented to the jury as one of two independent bases to support a finding of guilty under the situation prong of the risk of injury statute . . . ."

At oral argument before this court, counsel for the state conceded that its lack of prejudice argument hinges on the validity of the defendant's manslaughter conviction such that, if count one is reversed, count two must be reversed as well. Indeed, the state's argument that the defendant was not prejudiced by the duplicity of count two is premised on an assumption

---

[13] The defendant also argues that count two is duplicitous as to its elements because the state charged him, pursuant to § 53-21 (a) (1), with "plac[ing] [a child] in such a situation that the life or limb of such child was endangered" as well as "committ[ing] an act likely to impair the health [or morals] of such child . . . ." In light of our conclusion in part II of this opinion, we do not reach this argument.

that the jury unanimously found the defendant guilty of count one on the basis of shaking the victim. In part I of this opinion, however, we concluded that reversal of count one is required because there is a real possibility that the jury was not unanimous in finding the defendant guilty of manslaughter in the second degree for shaking the victim. Therefore, the state's lack of prejudice argument fails, and we conclude that reversal of the defendant's conviction under count two is required.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.